Todd M. Logan (SBN 305912)
tlogan@edelson.com
Rafey S. Balabanian*
rbalabanian@edelson.com
Alicia Hwang*
ahwang@edelson.com
EDELSON PC
329 Bryant Street
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

Eve-Lynn Rapp*
erapp@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Pro hac vice admission to be sought.

Attorneys for Plaintiff and the Putative Class

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ANTONETTE GRAYS, individually and on behalf of all others similarly situated, | Case No. |
| | **CLASS ACTION COMPLAINT FOR:** |
| *Plaintiff,* | |
| *v.* | 1. **Violation of Magnusson Moss Warranty Act (Breach of Full Written Warranty), 15 U.S.C. §§ 2301 et seq.;** |
| MONSTER, INC., a Delaware corporation, | 2. **Violation of Magnusson Moss Warranty Act (Breach of Limited Written Warranty and State Warranties), 15 U.S.C. §§ 2301 et seq.;** |
| *Defendant.* | 3. **Breach of Express Warranty, Cal. Com. Code §§ 2313 et seq;** |
| | 4. **Violation of Song-Beverly Consumer Warranty Act (Breach of Express and Implied Warranties), Cal. Civ. Code §§ 1792 et seq.;** |
| | 5. **Violations of Cal. Civ. Code §§ 1750 et seq.; and** |
| | 6. **Violations of Cal. Bus. & Prof. Code §§ 17200, et seq.** |
| | **DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Antonette Grays ("Plaintiff" or "Grays") brings this Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendant Monster, Inc. ("Defendant" or "Monster") for selling defective and mislabeled tablet computers. Plaintiff, for her Complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences, and as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## NATURE OF THE ACTION

1. Monster, one of the country's largest producers of premium consumer electronics, manufactures, distributes, and sells the "M7," a tablet computer.[1] Unfortunately for consumers, these M7s suffer from notorious charging port defects that make them substantially certain to fail prematurely. Monster also misrepresents the technical specifications of its M7s, leaving customers with only a fraction of the storage space and camera resolution that they pay for. Monster fails to correct these defects, despite thousands of complaints.

2. Plaintiff Grays purchased two M7 tablets based on Monster's warranties, representations, and strong brand name. Neither M7 functioned as advertised, and both quickly ceased operating altogether due to the notorious M7 charging port defects. The first failed within a month of light use, quickly enough to be returned to the store. The second survived about six months, so she had to ship it, at her own expense, to Monster's warranty servicer, which has now held it in "initial testing" *for over a year*. As it has with thousands of others, Monster refuses to so much as return Plaintiff's calls, much less her tablet or money.

3. Monster's misrepresentations deceive customers, and its charging port defects are substantially certain to cause premature and total device failure. Yet Monster refuses to acknowledge, fix, or even warn consumers about these problems, leaving thousands of individuals with broken and worthless tables and others with tablets that function below their

---

[1] A "tablet" computer is a mobile computer with its touchscreen display, circuitry, and power source all entirely contained in a single, portable unit.

1    advertised capabilities. Accordingly, M7 purchasers have not received fair value for their

2    money, and now bring this putative class action lawsuit (i) to prevent Defendant from

3    continuing to sell its defective M7 tablets and (ii) to recover damages and restitution for

4    those who already purchased them.

5                                                    **PARTIES**

6              4.        Plaintiff Antonette Grays is a natural person and citizen of the State of

7    California.

8              5.        Defendant Monster, Inc., is a corporation organized and existing under the

9    laws of the State of Delaware with its principal place of business located at 455 Valley Drive,

10   Brisbane, California 94005. Monster does business throughout the United States and the

11   State of California, including in this District.

12                                    **JURISDICTION AND VENUE**

13             6.        The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2),

14   because (i) at least one member of the Class is a citizen of a different state than the

15   Defendant, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and

16   costs, and (iii) none of the exceptions under that subsection apply to this action.

17             7.        This Court has personal jurisdiction over Defendant because Defendant has its

18   principal place of business here; designed the M7 here; distributed the M7 exclusively from

19   California; designed its false product representations in California; and because the events

20   giving rise to this lawsuit occurred, in substantial part, in California. Defendant also submits

21   in its online terms that product sales will be "governed by and construed under the law of the

22   State of California, without regard to conflicts of laws rules" and that "the courts of

23   California shall have exclusive jurisdiction over the parties for all disputes."

24             8.        Venue is proper in this District under 28 U.S.C. § 1391(b) because a

25   substantial part of the events giving rise to Plaintiff's claims occurred in, were directed to,

26   and/or emanated from this District. 28 U.S.C. § 1391(b)(2). Venue is additionally proper

27   because Defendant is registered to, and regularly does, conduct business in this District,

28   including by entering into consumer transactions, and because Defendant submits in its

1   online terms that "Venue shall lie exclusively and only in either (i) San Mateo County, State

2   of California; or (ii) the Northern District of California of the United States District Court."

3   **INTRADISTRICT ASSIGNMENT**

4        9.    Pursuant to Civil Local Rule 3-2(d), this case should be assigned to the San

5   Francisco Division.

6   **FACTUAL BACKGROUND**

7   **I.    An Overview of Monster's Business.**

8        10.    Monster is one of the country's largest producers of premium consumer

9   electronics. Best known for its "top-of-the-market" audio and visual cables, it manufactures,

10   distributes, and sells over 5,000 different premium electronic products under the slogan, "Get

11   All The Performance You Paid For." Monster claims to be the "world's leading manufacturer

12   of advanced connectivity solutions for high-performance home entertainment, audio, home

13   cinema, computer and gaming as well as a leading innovator in the field of mobile

14   accessories and professional audio." It claims "the name Monster Cable is so synonymous

15   with high quality and high performance, customers often assume that any cable they purchase

16   in reputable stores would be Monster even though there are other cable brands."

17        11.    Monster is well-known for charging premium prices and promising premium

18   performance for its products. For example, Monster manufactures High-Definition

19   Multimedia Interface ("HDMI") cables. Because HDMI technology is based on a proprietary

20   standard, there is very little functional difference between one HDMI cable and the next. *See*,

21   *e.g.*, *Why All HDMI Cables Are The Same* (c|net 2012)[2] (concluding that "Expensive HDMI

22   cables . . . offer no difference in picture quality over cheap ones.") Nonetheless, Monster

23   claims its HDMI cables are superior, and charges accordingly.[3] *See*, *e.g.*, <u>Figure 1</u>, below.

---

24   [2] Available at http://www.cnet.com/news/why-all-hdmi-cables-are-the-same (last accessed
25   December 21, 2015); *see also* Consumerist, *Do Coat Hangers Sounds As Good As Monster
     Cables?*, available at http://consumerist.com/2008/03/03/do-coat-hangers-sound-as-good-
26   monster-cables (last accessed December 21, 2015).

27   [3] Listed retail prices for basic six-foot HDMI cables on Walmart.com, with Monster's
     "Essentials" being one of the priciest. Also showing Monster's four-foot "Platinum" HDMI
28   cable at up to 17 times the price of equivalently-functioning six-foot HDMI cables.

---



**Figure 1** (example of Monster's premium pricing.)

12. As a general matter, Monster actively fosters the perception that it provides premium, top-quality consumer electronic products. It leverages its premium brand name to market over 5,000 different products, at all times promising to be "firmly committed to providing [its] customers with best in class, reliable products."[4] Among these products is its flagship tablet computer, the M7.

13. Unfortunately for consumers, and despite Monster's advertisements, the M7 does not live up to Monster's reputation or quality representations. *See*, *e.g.*, Tom's Hardware (noting "Consumer Reports is calling this tablet a 'Don't Buy,' which is a shame given that Monster is known for its high-end audio products; you expect the same quality with its new tablet line.")[5]

## II.    The M7: As Advertised.

14. On September 18, 2013, "Monster, the world leader in high-performance personal audio, connectivity solutions and headphones, . . . announced the launch of its first line of tablets—the Monster M7."[6]

[4] Monster, *Warranty FAQ*, available at https://www.monsterproducts.com/support/warranty (last accessed December 29, 2015).

[5] Tom's Hardware, *Consumer Reports Monster M7 Tablet*, available at http://www.tomshardware.com/news/consumer-reports-monster-tablet-m7,25016.html (last accessed January 6, 2016).

[6] Monster, *Monster Launches First Line of Tablets*, available at http://www.enhanced

15.     Monster claims it "engineered the finest in mobile computing" with the M7, which purportedly exemplifies the "quality craftsmanship that [consumers] have come to expect from Monster."[7] Among other things, Monster represents that the M7 is a "premium tablet," "fully loaded with features" and "packed with all the latest specs," including a "Micro USB input," a "rear (5.0MP) camera," and "16GB storage." Monster further represents that M7s have power cords and charging ports that comply with "Micro USB" specifications (which, in turn, specify a minimum rated lifetime of 10,000 cycles of insertion and removal between the connector and port). Monster represents that M7s can be "use[d]" and "enjoy[ed]," both through the one-year warranty period and potentially for "many years." *Id*. Monster includes these representations on and within its product packaging. *See* Figures 2-3, below.




**Figures 2-3** (showing product representations included with M7 packages).

16.     Monster further represents that M7s are functioning tablet computers. To be a

onlinenews.com/news/eon/20130918005559/en/Tablets/Headphones/Walmart.com (last accessed December 29, 2015).

[7] Monster, *Homepage: My Monster Tablet*, available at http://mymonstertablet.com (last accessed December 29, 2015).

1    tablet computer, a product must have a touchscreen display, circuitry, and battery combined

2    in a single, portable device. Monster expressly represents that its M7 tablets are portable and

3    contain batteries that "will be charged" when a tablet user "connect[s] the supplied DC

4    Charger to the 'Micro USB/Charger Interface' port on the tablet and the AC outlet on the

5    wall."[8] *See* <u>Figure 4</u>, below.

6

7    

8

9    **Figure 4** (charging instructions).

10   ## III.   The M7: As Delivered, with Critical Design and Manufacturing Defects.

11          17.     M7s, as designed and manufactured, suffer from defects and do not conform

12   with Monster's express or implied warranty representations. Specifically, M7s do not

13   conform to "Micro USB" specifications in ways that predictably cause the charger ports to

14   dislodge, rendering the tablets inoperable and unfit for their intended use. M7s also do not

15   meet advertised specifications, such as having 5.0MP cameras or 16GB of available storage,

16   and further suffer from a host of software problems that routinely render them inoperable.

17   Monster, while aware of these defects, fails to provide refunds or adequate warranty repairs.

18          **A.     M7 charger cables do not meet "critical" Micro USB specifications.**

19          18.     A typical charger cable contains two ends, one of which connects to a device.

20   This connecting end, typically called a "plug" or "connector," is designed to be inserted into

21   a "receptacle" or "port" on the device itself. Typically, connectors and/or ports have

22   mechanisms for actively or passively staying attached to each other, such as magnets or

23   latching blades.

24          19.     Under Micro USB specifications, connectors use passive latching blades to

25   stay attached to Micro USB ports. These blades must be built to specified dimensions to

26   avoid product wear and/or failure. Specifically, in March of 2010—three years before the M7

27   was first produced—the USB Implementers Forum set the maximum height for Micro USB

28   ---
     [8]      Monster, *Quick Start Guide: M7 Tablet*, included with product purchase.

latching blades at 0.6 millimeters, precisely because "the variation in design of the passive latching feature has led to combinations with excessive extraction forces, resulting in customer dissatisfaction and the potential for device failures (broken cables or peeled off receptacles)."[9] The Forum cautioned that "[i]t is fairly critical to proper operation that the plug's latch feature be designed as described by the new reference dimensions." *Id*.

20.    Nonetheless, M7 charger cables have latching blades that exceed the Micro USB maximum height specifications as well as industry averages. *See* <u>Figures 5-7</u>, below. *Id*.

 

**Figure 5** (Micro USB specifications, showing max latch height of .6mm).

**Figure 6** (M7 connector, with latch height of .646mm).



**Figure 7** (M7 latch height is the tallest of a random sampling of brands).

21.    Monster's failure to follow Micro USB latch-height specifications causes the very problem these specifications were designed to prevent: "peeled-off receptacles," resulting in "device failures."

22.    Specifically, each M7 comes with a Micro USB charging port that connects to the battery through a printed circuit board. *See* <u>Figure 8</u>, below. This connection is what allows an electric current to flow from the port to the battery, enabling the device to charge.

---

[9] USB Implementers Forum, *Maximum Un-mating force value definition to micro connector USB 2.0*, Engineering Change Notice (March 23, 2010).

**Figure 8** (showing a Micro USB charger interface port attached to a circuit board).

23.     Because M7 connector blades are too tall, excessive extraction forces occur during normal use. Predictably, these forces cause the charging ports to routinely peel off of the circuit boards, severing the connection between the ports and the batteries and rendering the M7s unable to charge.

24.     Monster's latching blade defects are compounded by design and/or manufacturing weaknesses in the ports themselves.

**B.     M7 charger ports are defectively designed and manufactured.**

25.     M7 charger ports suffer from a number of design and/or manufacturing faults that, collectively, cause a substantial increase the risk of port breakage during normal use. When coupled with Monster's defective latching blade connectors, these additional port defects virtually ensure premature device failure.

26.     First, M7 charger ports are improperly oriented, in violation of USB standards. Specifically, all USB cords come with USB Icons embossed on the topsides of the connector plugs. Among other things, these embossed icons let consumers intuitively see and feel the proper connector plug orientation, and thus serve to "facilitate alignment during the mating process."[10] *See*, *e.g.*, Figure 9, below (showing embossed icons on connector tops).

27.     To make use of this common-sense feature, USB standards state that ports "should be oriented to allow the Icon on the plug to be visible during the mating process." *Id*. Nonetheless, in M7s, the USB charger ports are oriented in reverse, such that the power cords must be inserted upside-down (with the USB icons facing away from the consumers). *C.f.*

---

[10] Universal Serial Bus Specification Revision 2.0, Section 6.5.1 (April 27, 2000).

Figures 9-10, below.





**Figure 9** (properly-oriented Micro USB ports, with narrow ends oriented upwards).[11]

**Figure 10** (M7 Micro USB port, with narrow end oriented downwards).

28.     Consumers generally expect the USB icons on their charger cables to be oriented upwards. By doing the opposite of what consumers expect, Monster invites them to routinely attempt upside-down insertions, thus multiplying the mechanical stress exerted upon the charging ports themselves.

29.     Moreover, because consumers do not operate tablets on a level plane, Monster's reverse USB orientation changes the angle at which connectors are typically inserted into the M7 charger ports.

30.     Specifically, consumers tend to hold and use tablets at slight angles, such as that shown in Figure 11, below.



**Figure 11** (normal angle for tablet use).[12]

---

[11] Global Connector Technology, USB Mount Image, available at http://gct.co/gctconnexion/microUsb/images/Reverse-Type-USB.jpg (last accessed January 6, 2016).

31.     This typical user angle multiplies the problems inherent to Monster's reverse port orientation. More specifically, with a standard Micro USB orientation, the latching blades on the connectors are pulled away from the ports when inserted or extracted at the typical user angle. With the reverse orientation featured by M7s, however, the opposite occurs, such that the latching blades are pushed into the port, reducing exit space and increasing the mechanical strain imposed on the ports themselves. *See* Figure 12, below.



**Figure 12** (illustration showing how, under typical use, a standard orientation can relieve mechanical stress, whereas the M7's reverse orientation can increase mechanical stress) (angles and dimensions exaggerated for illustrative purposes).

32.     Additionally, the casing for the M7 was not designed to provide adequate relief against mechanical strain. Micro USB ports are designed to reside inside tight enclosures (*e.g.*, cellphone cases) that are typically structured to help hold the ports in place and relieve mechanical strain. In M7s, however, there are air gaps directly above the charging ports, instead of supportive casing. Additionally, Monster uses a recessed design for its Micro USB ports, whereby they are pushed fully inside of the casing (and are thus unable to use any support the casing could otherwise provide). Accordingly, the charger ports are forced to bear the full brunt of vertical mechanical strain during insertion and extraction cycles, without assistance from the enclosure itself. *See* Figure 13, below.

---

[12] Pixabay, *Stock Photographs: Person Reading Tablet*, available at https://pixabay.com/en/ tablet-computer-woman-reading-690032 (last accessed January 6, 2016).



**Figure 13** (showing recessed port design and location of internal air gap.)

33.     Additionally, and despite the aforementioned weaknesses, the charging ports themselves are only secured to the circuit boards using two soldered contacts, as opposed to four. *C.f.* Figures 14-15, below.



**Figure 14** (M7 port, attached with only two soldered contacts.)

**Figure 15** (Comparison Micro USB port with four soldered contacts.)

34.     Collectively, the above-described port defects, along with other weaknesses, cause M7 ports to routinely fail. Many consumers have received M7s with ports broken on arrival, before first use. Predictably, these weak port problems are compounded by the use of defective and oversized Micro USB cables. As a result, M7s routinely and predictably fail, by the thousands, and are substantially certain to do so, as reflected through Plaintiff's own experiences and through legions of online complaints.

35.     Moreover, even before failure, M7s do not operate as advertised, as explained further below.

**C.    M7s do not conform to their stated technical specifications.**

36.    Monster misrepresents the features and capabilities of M7s, artificially increasing their perceived value and causing consumers to pay more than they otherwise would. For instance, Monster claims that M7s take five megapixel ("MP") pictures, when in fact they only take 3.1MP pictures out of the box. Similarly, Monster advertises that M7s come with sixteen gigabytes ("GB") of available storage, when in fact they have less than 1GB generally available for most user applications under ordinary use. Additionally, M7s come with built-in firmware defects that routinely cause the tablets to "freeze" and become unusable.

**i.    M7s do not take 5.0MP pictures.**

37.    A megapixel, meaning one million pixels, is a technical specification for measuring how much detail an image will have. Megapixels are perhaps the most well-known and prominently advertised "on-the-box" technical specifications for digital camera products.

38.    As with other prominent "on-the-box" specifications, megapixel ratings give consumers an easy way to compare products. Consumers view products that produce 5.0MP pictures as being of higher quality and of more value than otherwise-equivalent products that only produce 3.1MP pictures.

39.    Moreover, as with other prominent "on-the-box" technical specifications, megapixel specifications create a "spillover" impression on overall product quality, in that consumers see higher megapixel specifications as a signal that a product contains higher-quality materials and components overall. Accordingly, consumers will pay more for higher megapixel-rated consumer electronics products than for lower-rated ones, even if they do not intend to use such products for photography.

40.    Monster, an experienced consumer electronics company, knows that its target consumers will pay more for products that produce higher-megapixel photographs, and as a result it has prominently advertised—online, in its press releases, and on its product packaging—that its M7 tablets come with 5.0MP rear-facing cameras.

41.     Contrary to these express representations, however, M7s do not produce 5.0MP pictures out of the box. Rather, M7s come with two camera applications preinstalled, both of which only allow for a maximum picture resolution of 3.1MP (*i.e.*, approximately 60% of what Monster expressly warrants).

42.     Specifically, the preinstalled stock application for photographs—called the "Camera" application—lets users select the megapixels setting for the rear-facing camera. The highest available setting is 3MP. There is no 5.0MP option available. *See* <u>Figure 16</u>, below.



**Figure 16** (showing "3M" as the max resolution for the stock "Camera" application).

43.     Pictures taken with this "Camera" application at its highest resolution setting actually result in 3.1MP pictures (specifically, 1526x2048 pixels, amounting to 3,145,728 total pixels). No available setting actually produces 5.0 MP pictures.

44.     Similarly, the preinstalled "Camera MX" application also lets users select the megapixels setting for the rear-facing camera. The available options range from 1-4MP. There is no 5.0MP option available. *See* <u>Figure 17</u>, below.



**Figure 17** (showing "4 MP" as the max resolution for the "Camera MX" application).

45.     However, pictures taken with the "Camera MX" application, even at its

highest "4 MP" setting, only result in 3.1MP pictures, the same as with the stock "Camera" application (again, 1526x2048 pixels, amounting to 3,145,728 total pixels). No available settings produce 5.0MP pictures.

46.     In short, M7s do not come with applications or settings that allow users to take pictures with a resolution greater than 3.1MP, much less the 5.0MP that Monster expressly warrants.

**ii.     M7s do not come with 16GB of available storage.**

47.     A gigabyte, meaning one billion bytes, is a technical specification for measuring data storage. As with megapixels, gigabytes are among the most well-known and prominently advertised "on-the-box" technical specifications that consumers consider when purchasing electronic products.

48.     Gigabyte specifications let consumers easily compare products, and are considered especially important for small portable devices like computer tablets. Consumers heavily consider gigabyte specifications when making purchasing decisions, and perceive products that offer 16GB of available storage as being of higher quality and of more value than otherwise-equivalent products that offer less storage.

49.     Moreover, as with megapixels, gigabyte specifications create a "spillover" impression on overall product quality, in that consumers perceive higher gigabyte specifications as a signal that a product generally contains higher-quality materials and components overall. Accordingly, consumers will pay more for higher gigabyte-rated consumer electronics products than for lower-rated ones, even if they do not intend to use all of the storage available.

50.     Monster, an experienced consumer electronics company, knows that its target consumers will pay more for products with more storage, and as a result it has prominently advertised—online, in its press releases, and on both the front and back of its product packaging—that its M7 tablets come with 16GB of available storage.

51.     Nonetheless, M7s actually come with 13.26GB of available storage, not the 16GB as advertised. Worse, Monster programmed its M7s to "partition" this storage in ways

that materially limit its general use. Specifically, instead of having a single internal storage partition for applications and data, Monster created two: an "Internal Storage" partition, with 0.98GB of storage available, and a "NAND Flash" partition, with 12.28GB available.

52.     By default, and due to Monster's programming choices, most applications are preloaded and downloaded into this smaller, 0.98GB Internal Storage partition. Indeed, Monster stores the vast bulk of preloaded (and often unmovable) applications in the already-limited 0.98GB Internal Storage space (with over half already used up at the time of sale), while also funneling most user-downloaded applications into this same, limited space, by default. Consequently, the 0.98GB Internal Storage partition quickly runs out of space during normal use, while the 12.28GB NAND Flash partition remains largely idle.

53.     Accordingly, consumers have relied heavily on Monster's advertised 16GB storage capabilities, only to find that their M7s come equipped with 13.26GB of total stated storage and less than 1GB of storage actually available for ordinary use, with most of this 1GB already occupied by preinstalled applications. *See, e.g.*, <u>Figure 18</u>, below (showing an actual screenshot of an M7's storage data, where *60 times* as much application data has been allocated to the smaller 0.98GB Internal Storage partition, as opposed to the larger 12.28 GB NAND Flash partition).



**Figure 18**.

54.     Predictably, and as a direct result of Monster's programming choices, consumers end up with far less available storage available than expected, and are frequently left disappointed with their M7 purchases. *See* <u>Figures 19-21</u>, below.



**Figure 19** (storage complaint).





**Figure 20** (same).                                **Figure 21** (same).

55.     There is no way to actually access the 16GB of available storage that Monster advertises, and without sophisticated alterations most consumers are left limited to less than 1GB of actual usable storage for all of their applications and application data.

        **iii.**     **M7s routinely "freeze" on users.**

56.     At the least, Monster's copious quality representations imply that its M7 tablets will serve as actual, operational computer tablets, such that consumers will be able to actively make use of them under normal conditions.

57.     Nonetheless, in 2013, Consumer Reports gave the M7 a "Don't Buy" rating,

primarily because *all* of the tablets it tested repeatedly "locked-up" or "froze," ending any possible use and requiring "hard shutdowns" to temporarily fix:

> "The Monster M7 tablet we tested recently has a problem: It locks up regularly. We've bought three samples so far, and have had trouble with all three staying active during our continuous-use battery test. The lockup—evidenced by a frozen or blank screen while the backlight stays on—happened anytime from within an hour to several hours of use while surfing the Web using Wi-Fi, or even while just sitting idle. We were able to perform a hard shutdown and restart to clear the problem, until it happened again. . . . Based on our experience with multiple devices in our labs, we have to give the M7 a Don't Buy recommendation."[13]

58.     Similarly, in 2014, Product-Reviews.net found that consumers still complained of the "freezing" issue, in droves (along with the notorious charging port issues):

> "A year after Consumer Reports gave this tablet a 'don't buy' rating, we can see that negative reports are still coming in this month at Walmart, the retailer which sells the Monster M7 Tablet exclusively.
>
> To give you an example of this, head to the Monster M7 Tablet review page here over at Walmart, and you'll see that there are a whopping 1011 reviews that have been left by those that have already bought one.
>
> Look to the right of the page, select *'Newest to Oldest'* and you will see that the first 10 reviews left are actually all negative 1-star reviews.
>
> The majority of these reviews have a worrying theme to them as well – either the charging port snapped, or the charging port was pushed or forced into the Monster M7 so that it wouldn't charge anymore.
>
> Combine that with other complaints about freezing and it looks this tablet is still having problems in 2014. Those user reviews do not lie and when you have hundreds of reports coming in, all about the broken Monster M7 tablet charging port, you may be better off looking elsewhere for a cheaper tablet this month."[14]

59.     Tablets cannot be used while "frozen," and "hard shutdowns" can result in lost data. Consumers will pay less for tablets that routinely "freeze" than for tablets that continually operate under normal conditions, if they buy such tablets at all.

---

[13] Consumer Reports, *Monster M7 Tablet Locks Up in Consumer Reports Test*, available at http://www.consumerreports.org/cro/news/2013/11/monster-m7-tablet-locks-up-in-consumer-reports-test/index.htm (last accessed January 25, 2016).

[14] Product-Reviews.net, *Monster M7 Tablet*, available at http://www.product-reviews.net/2014/11/22/monster-m7-tablet-charging-port-freeze-problems-persist (last accessed January 6, 2016).

**IV.     Thousands have Complained About Monster's Defective Tablets.**

60.     Consumer complaints over Monster tablets are legion. Thousands have complained about broken charger ports, as well as Monster's failure to adequately honor its warranties. Fox News has reported on it.[15] A cottage industry of dedicated online repair shops have profited from it.[16] As one website put it, "[t]his is not an exaggeration folks, [the USB ports] ALL break off," and yet "Monster seems to ignore the problem and keeps on selling them":

---

**Known Issues**

Most of the apps you want on the tablet want to be in "flash" memory. Since there is only 1GB, this becomes an issue right away.

Now the "kicker": the microUSB connectors on these tablet will all eventually break from the motherboard, requiring micro soldering for repair. This is not an exaggeration folks, they ALL break off (unless you never plug the cable in; which means you won't use it long since this is the only way to charge the battery). I have seen a multitude of posts about this problem all over the web. Monster seems to ignore the problem and keeps on selling them. If you go through the trouble of contacting support and trouble yourself with returning it, you will not see it for six to eight weeks, at least, and you will not get you're tablet back, but rather some tablet they had laying around. This is maddening! *So you think you were smart and bought the tablet at Walmart and paid for the extended warranty?* Ha! They'll just give you your money back. *But what about all the stuff I had on it?* Bummer.

---

**Figure 22**.[17]

61.     For instance, as of January 28, 2016, *all* of the five most recent complaints that display on walmart.com's review page complain of charging port troubles (coupled with Monster's widespread failure to adequately honor its warranty). *See* Figures 23-27, below.

---

[15] Fox News, *Mom deals with monster problem trying to get tablet repaired* (noting estimated 50 calls to warranty servicer, without avail) (reported on August 27, 2014), available at http://www.fox4kc.com/204/08/27/mom-deals-with-monster-problem-trying-to-get-tablet-repaired/ (last accessed December 29, 2015).

[16] *See, e.g.*, https://www.ebay.com/itm/321559681344 (offering "Fast Repair Service for Micro USB Charging Sync Port" on "Monster M7 7" Tablet" for $124.99, with 74 repairs sold and 100% positive feedback) (last accessed December 29, 2015).

[17] IFixIt, *Monster M7 Tablets*, https://www.ifixit.com/device/monster_m7_tablet (last accessed December 29, 2015).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**This Tablet is Just OK**                                                                    10/23/2015

★★★☆☆  by AllMonsteredOut

While graphics are nice, I had to return this tablet to Monster because the power jack came out after 3 months. I sent it in for "repair or replacement" After 4 months I called them, because I had not heard anything back from them. Then, they said, oh, we can't repair it, we have to replace it... This couldn't have been told to me 3 months ago? You did have my contact info.... I digress. ... I was told all they had in stock had minor scratches around jack, or I had to wait up to three weeks for new ones to come in. .....Seriously, I just waited four months...... We decided to take one with minor scratches. Got in the mail 3 days later. The volume control is messed up and there are issues with the jack. The solution is to send it back to monster... Not so sure I want to... It's a decent tablet when it's working... But I won't be buying another one any time soon.

Read less

**Figure 23** (noting "power jack came out after 3 months" and poor warranty service).

**Poor Customer Service**                                                                      10/9/2015

★☆☆☆☆  by Frustrated

I purchased two of these tablets as Christmas gifts. One of them the port fell out in less than three months. Since it was past the 30 days, I was unable to return to the store, so there started my frustration with Monster7 customer service. I was told the tablet would be repaired or a new one would be sent within 6-8 weeks. Six months later I still don't have a tablet, customer service won't take my calls as they have referred this issue to "Upper Management", for which they will only give me an email address. I have sent numerous emails to Upper Management and have received no response. Stay away from Monster7!!!

**Figure 24** (noting that a "port fell out in less than three months" and poor warranty service).

**Junk, not worth the one star I had to give it.**                                            9/23/2015

★☆☆☆☆  by NotHappy

Poor soldier joints on the usb charge port. Sent back to Monster for a replacement in December 2014, it's now September 2015 and getting a run around from them saying it has to go through a testing and repair process. So 9 months so far to "test" this piece of junk tablet. And now emails are returned as undelivered.

**Figure 25** (noting the poor solder joins on the USB port and poor warranty service).

**Poor Customer Service**                                                                      7/29/2015

★☆☆☆☆  by fveseth

I really liked this tablet, good value for the price - for about 3 months. Then like everyone else, my tablet would no longer charge. In fact the charge port came right out of the tablet.
Because I had if for such a short time, it was still under warranty. So, even though we had purchased the service plan from Wal Mart, we had to go back to the company.
They were very helpful up to the point that they got my tablet. They have now had it in their possession for 10 weeks - almost as long as it worked. They did respond to my first email after they received the tablet, they said they were working on it and if I had questions to call their customer service number. I have called a couple of times in the last 3 weeks & their recording assures you they will get back to you in 48 business hours. No response to my calls or to my last email. Not sure when or if I will ever have a Monster tablet again. It is really too bad because it was a very nice tablet for the price, exactly what I needed. If they would just upgrade this one issue I think it would be a great tablet.

**Figure 26** (noting that "the charge port came right out of the tablet" within about 3 months, and also noting poor warranty service).

1

2

3

4



**Bad tablet**                                                    5/4/2015
⭐ ☆ ☆ ☆ ☆   by dadams417

Bought 2 of these tablets. One was fine the other the port to charge is faulty. I was told there has been an issue with that. It has taken a lot of effort to keep on top of this with Monster tablet. They don't handle the situation well.

5   **Figure 27** (noting that "the port to charge is faulty" and that Monster has not handled the situation well).

6        62.    Many consumers have also complained through the Better Business Bureau,

7   often with stories similar to the following (*i.e.*, complaining of a tablet that did not last very

8   long (here, not even a single day) that gets stuck in Monster's inadequate warranty system,

9   without resolution (here, for nearly a year)):

10   ▭ 01/23/2015    Problems with Product / Service | Read Complaint Details

11        **Complaint**                                              X
        Defective tablet. Was told to send in for repairs and it would be replaced. Its been 7
12        months and no replacement.
        I sent my tablet in for repairs in the beginning of may. I supplied all documents and
13        pictures as requested by Monster. I was told they would look into it. After months of back
        and forth with customer service, i was finally told on August 26th that i would have a
14        replacement tablet sent but they did not have the color of my tablet in stock (pink) and
        what other color would i like. I replied back the same day and said blue would be fine.
15        After waiting several weeks. ...no tablet. Ive sent more emails and finally got a call from
        the manager "Jose" who told me my tablet would ship in the next few days. It is now Dec.
16        10th and i STILL have not received my replacement tablet. At this point, I've already had
        to PAY to ship it to them and had to buy a new tablet (different brand...never give your
17        money to these con artists), i want a refund. I do not want the tablet, it broke the VERY
        first day I used it (charger port completely embedded inside tablet). It takes a minimum of
        2 days to get a response from customer service, im guessing because they ha e ALOT of
        repairs to complete on their unsatisfactory tablets. And when they finally respond, its
18        always the same generic response. I want my money back.

19        **Desired Settlement**
        I want the full amount I paid for this tablet (79.00) plus the shipping (7.87)

20        **Business Response**
        We will reach out to the customer and assist her with a refund for the tablet. Once we
        receive the required information, we will process a refund check.

21        **Consumer Response**
        (The consumer indicated he/she DID NOT accept the response from the business.)
22        I emailed George back with my personal infirmation. I am awaiting a response. I do not
        want to close this case until myrefund is received. If their refund process is anything like
        their repair pprocess, i am not hopeful.

23        **Final Business Response**
24        We are assisting this customer with a refund already. She is aware of this and we are in
        the process of cutting a check for her. It will be mailed out late next week.

25        **Final Consumer Response**
        (The consumer indicated he/she DID NOT accept the response from the business.)
26        I still have not received a refund check. The entire customer service department is
        EXTREMELY slow.

27

     **Figure 28**.

28

63.     Monster's M7 product defects are widespread, are always present at the time of purchase, and have harmed thousands of consumers in the same, predictable, well-known ways. If consumers knew about these product defects, they would have paid less for their M7s, if they purchased them at all.

**V.     Plaintiff Grays's Experience with her Defective M7.**

64.     During March of 2014, Plaintiff Grays purchased a Monster M7 from a Wal-Mart retail location in California at a cost of approximately $100.

65.     At the time of her purchase, Plaintiff reviewed the product packaging and the representations concerning, among other things, the presence of a 5.0MP camera and 16GB of storage. She noted that these specifications compared favorably with other competitive products and viewed them as a signal of overall product quality. She relied on the accuracy of these specifications and found them material to her purchasing decision.

66.     Similarly, Plaintiff relied on Monster's general brand equity and reasonably expected that her M7 would be fit for its advertised use as a functioning mobile computer tablet. She did not expect that she would be deprived of access to her tablet or of the data she accumulated on it.

67.     Nonetheless, within a month of light use, the charger port of Plaintiff's M7 broke off from the circuit board. Because this defect manifested within a month's time, Plaintiff was able to return her M7 to the retail store for a refund.

68.     Believing that this defect was a fluke and again relying on Monster's product representations and the strength of the Monster brand, Plaintiff bought a replacement M7 from walmart.com in April of 2014, again paying approximately $100.

69.     This second tablet lasted for approximately half a year, but by November of 2014 it had also failed as a result of the charger port breaking from the circuit board. Because this defect took longer than a month to manifest, Plaintiff could not return her tablet to the store, but instead had to contact Monster directly for warranty service.

70.     Plaintiff promptly contacted Monster for warranty service, and on November 25, 2014, "Monster Support"—using the email address "service@mymonstertablet.com"—

emailed Plaintiff with instructions to ship her M7 tablet to its authorized warranty servicer, LTI Computer, Inc. ("LTI"), in Walnut, California, for warranty service and repairs. As instructed, Plaintiff delivered her M7 to LTI's service location in Walnut, California, by December 23, 2014.

71.    Monster Support claimed a "normal turn-around time" of "3-6 weeks" to repair the charger port issue experienced by Plaintiff.

72.    After approximately six weeks, Plaintiff requested a status update. Monster Support responded in February, stating that her M7 was "currently in our lab going through the initial testing state" and that it was "diligently working on returning [Plaintiff's] tablet as soon as possible." It gave her a telephone number to call for future status updates.

73.    Between February and July of 2015, Plaintiff made several calls to the telephone number provided by Monster Support. She did not reach any representatives, but was able to leave messages. Her calls were not returned.

74.    On July 2, 2015, Plaintiff again wrote to Monster Support to request the status of her tablet, noting that "[y]our company said it would only take up to eight weeks to fix and it has been seven months. I have contacted your company by phone and no one has returned my calls." Monster wrote back, telling Plaintiff that her M7 was *still in the initial testing stage* and that its technicians "cannot skip steps to speed the process up."

75.    Now, more than a year after initially seeking warranty service, Plaintiff has still not received a refund, a repaired tablet, a replacement tablet, or even a status update indicating anything other than that her tablet is still undergoing "initial testing."

76.    Had Plaintiff known of the defects in the M7 product line, or that M7s do not conform to their advertised technical specifications, or that Monster fails to provide adequate warranty services for M7s, she would not have been willing to pay the full price for her M7 tablets, or she would not have purchased them at all.

77.    As it stands, Plaintiff has suffered actual damages as the result of Defendant's conduct in the forms of monies paid for her M7 and monies paid by her to ship her M7 to Defendant's warranty servicer.

**CLASS ALLEGATIONS**

78.   **Class Definition:** Plaintiff Grays brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of herself and a class and subclass of similarly situated individuals (collectively, the "Classes"), defined as follows:

> <u>Nationwide Class</u>: All individuals in the United States who purchased a Monster M7 tablet computer.

> <u>California Subclass</u>: All members of the Nationwide Class who are domiciled in the State of California or who purchased a Monster M7 tablet computer online at "walmart.com."

The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

79.   **Numerosity**: The exact number of members of the Classes is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. The Classes likely consist of thousands of individuals and other entities. Members of the Classes can be easily identified through Defendant's records and/or Defendant's retail partners' records.

80.   **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include but are not limited to the following:

a)      Whether M7 tablets suffer from design and/or manufacturing defects;

b)      Whether M7 tablets conform to Monster's product advertisements;

c)      Whether M7 tablets use non-compliant and defective Micro USB components that routinely cause device failure;

d)     Whether M7 tablets take 5.0MP pictures or offer 16GB of available storage;

e)     Whether Defendant's conduct violated the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*;

f)     Whether Defendant's conduct violated Cal. Civ. Code §§ 1750, *et seq.*;

g)     Whether Defendant's conduct violated Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

h)     Whether Defendant's conduct constitutes a breach of implied warranty of merchantability pursuant to the Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1792 and 1791.1, *et seq.*; and

i)     Whether Defendant's conduct constitutes a breach of express warranty, Cal. Com. Code § 2313.

81.     **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Classes. Plaintiff and members of the Classes sustained damages as a result of Defendant's uniform wrongful conduct during transactions with Plaintiff and the Classes.

82.     **Adequate Representation**: Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Classes, and she has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiff nor her counsel has any interest adverse to those of the other members of the Classes.

83.     **Policies Generally Applicable to the Classes**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes and making final injunctive relief appropriate with respect to the Classes each as a whole. Defendant's policies challenged herein apply and affect the members of the Class and Subclass uniformly and

1  Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the

2  whole of each the Classes, not on facts or law applicable only to Plaintiff.

3      84.   **Superiority**: This class action is also appropriate for certification because

4  class proceedings are superior to all other available methods for the fair and efficient

5  adjudication of this controversy and joinder of all members of the Classes is impracticable.

6  The damages suffered by the individual members of the Classes will likely be small relative

7  to the burden and expense of individual prosecution of the complex litigation necessitated by

8  Defendant's wrongful conduct. Thus, it would be virtually impossible for the individual

9  members of the Classes to obtain effective relief from Defendant's misconduct. Even if

10 members of the Classes could sustain such individual litigation, it would not be preferable to

11 a class action because individual litigation would increase the delay and expense to all parties

12 due to the complex legal and factual controversies presented in this Complaint. By contrast, a

13 class action presents far fewer management difficulties and provides the benefits of single

14 adjudication, economy of scale, and comprehensive supervision by a single court. Economies

15 of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

16     85.   Plaintiff reserves the right to revise the foregoing "Class Allegations" and

17 "Class Definition" based on facts learned through additional investigation and in discovery.

18
      **COUNT I**
      **Violation of Magnuson-Moss Warranty Act**
19    **Breach of Full Written Warranty**
      **15 U.S.C. §§ 2301 *et seq.***
20    **(On Behalf of Plaintiff and the Nationwide Class)**

21     86.   Plaintiff incorporates by reference the foregoing allegations as if fully set

22 forth herein.

23     87.   Plaintiff and the Nationwide Class purchased M7 tablets that were

24 manufactured by Defendant.

25     88.   The retail price for M7 tablets (and the amounts actually paid by Plaintiff and

26 the members of the Nationwide Class) was as high as $149, and at all times exceeded $25 per

27 tablet.

28     89.   M7 tablets are consumer products as defined in 15 U.S.C. § 2301(1) because

they are tangible personal property distributed in commerce and are normally used for personal or household purposes.

90.     Plaintiff and members of the Nationwide Class are consumers as defined in 15 U.S.C. § 2301(3).

91.     Defendant is a supplier and warrantor as defined in 15 U.S.C. §§ 2301(4) and (5) because it is in the business of making consumer products directly or indirectly available to consumers and because it has issued written warranties to consumers.

92.     On the outside packaging of each M7 tablet is a written website address of "mymonstertablet.com," which is a website owned and operated by Defendant. Defendant uses this website to provide information about M7s and to promote sales of M7s.

93.     On this website, Monster describes its one-year "Manufacture warranty," in its entirety, as follows:

**Q: What is the warranty period?**
A: The Manufacture warranty is for one year.

**Q: What does the manufacture warranty cover?**
A: The manufacture warranty covers defects within the tablet e.g. broken speaker, unresponsive touch/buttons.

**Q: Does the manufacture warranty cover crack screens?**
A: No, the manufacture warranty does NOT cover accidental damage.

**Figure 29.**

94.     As such, Monster states, in writing and in connection with each M7 purchase, that it will provide a "Manufacture warranty" for a specific period of one year, whereby it will undertake to cover or to otherwise take remedial action with respect to defects within M7 tablets (in the event that such defects exist). By including a link for this "Manufacture warranty" on the outside packaging of each M7, Monster offers it in connection with each M7 sale, and it forms part of the basis of the bargain between Monster and each ultimate purchaser of an M7 tablet, including Plaintiff and each member of the Nationwide Class. Accordingly, Monster's "Manufacture warranty" constitutes a "written warranty" pursuant to 15 U.S.C. § 2301(6).

95.     The link to "mymonstertablet.com" that Monster includes on the outside

package of each M7 tablet—and the written "Manufacture warranty" therein described—is the only "written warranty," as defined in 15 U.S.C. § 2301(6), that Monster makes available to consumers *prior* to their purchase of an M7. Monster does not otherwise use the word "warranty" on the outside of its packaging or on "mymonstertablet.com," other than as reproduced above, and does not provide any other materials concerning its "Manufacture warranty."

96.     Monster's "Manufacture warranty" contains no qualifications or disclaimers, other than a statement of limited duration and a disclaimer of coverage for "accidental damage," both of which are consistent with "full" warranties pursuant to 15 U.S.C. §§ 2303(a), 2304. Additionally, Monster is required to conspicuously designate its "Manufacture warranty" as either "full" or "limited," as required pursuant to 15 U.S.C. § 2303, yet fails to do so. When a required term is omitted from a warranty, the term most favorable to the customer should be supplied. Accordingly, Monster's "Manufacture warranty" constitutes a "full" written warranty pursuant to 15 U.S.C. § 2303, and is subject to the requirements of 15 U.S.C. § 2304.

97.     The M7 tablets purchased by Plaintiff and the members of the Nationwide Class contained numerous defects and failed to perform as Defendant promised. Material defects with all M7 tablets, present at the time of sale, include but are not limited to:

       (a)     Defective Micro USB cords and charging ports, out of compliance with Micro USB specifications, with design and manufacturing defects substantially certain to cause total device failure within the one-year warranty period;

       (b)     Defective hardware and software, with design and manufacturing defects that cause M7s to perform below their stated technical specifications, such as producing 5.0MP pictures and providing 16GB of available storage; and

       (c)     Defective hardware and software, with design and manufacturing defects that cause M7s to routinely "freeze" and become inoperable.

98.     In breach of its full written warranty, Defendant did not remedy these defects within a reasonable time and without charge, as required to conform with its full written warranty. 15 U.S.C. § 2304(a)(1).

99.     In breach of its full written warranty, Defendant did not permit Plaintiff or the Nationwide Class to elect refunds for their M7 purchases, nor did it replace their M7s, without charge, with tablets that do not suffer from the aforementioned defects. 15 U.S.C. § 2304(a)(4).

100.     Monster has not demonstrated that workable repairs for the aforementioned defects even exist, and replacing M7s with identical and equally defective M7s cannot bring them into compliance with Monster's full written warranty.

101.     The defects as described above were present at the time of sale for each M7 tablet, and thus were not caused by damage while in the possession of Plaintiff and the Nationwide Class, nor were they the result of unreasonable use.

102.     Plaintiff notified Defendant of its breaches within a reasonable time by writing to and calling Defendant numerous times within the one-year warranty period. Defendant was also on notice of its design and/or manufacturing defects from the complaints and/or repair or replacement requests that it received or reviewed, and from its testing, diagnostic, maintenance, repair, and/or replacement records.

103.     Nevertheless, Plaintiff and the Nationwide Class were not required to notify Defendant of its breaches because it is a manufacturer and supplier of M7 tablets, not a retail seller, and because affording Defendant a reasonable opportunity to cure its breaches would have been futile. Indeed, even after Plaintiff notified Defendant of its breaches, it refused to acknowledge any defects and would not repair her tablet or replace it with one that did not suffer from such defects, nor would it refund the money she paid.

104.     Defendant failed to cure its warranty breaches even after being given a reasonable amount of time and/or a reasonable number of attempts to do so, and did not refund money to Plaintiff of the Nationwide Class members or otherwise take adequate remedial action.

105.    As a direct and proximate cause of Defendant's warranty representations and breaches, Plaintiff and the other members of the Nationwide Class have suffered actual damages in the form of the difference between the price they paid for the M7 tablets as warranted and the value of the tablets they actually received. Had Plaintiff and the members of the California Subclass known that their Monster M7 tablets would not be as warranted, they would not have purchased them at the prices paid, if at all.

106.    As a result of Defendant's violations of Magnuson-Moss, Plaintiff and the Nationwide Class seek to recover actual damages, injunctive and declaratory relief, costs and attorneys' fees, and all other available remedies.

**COUNT II**
**Violation of Magnuson-Moss Warranty Act**
**Breach of Limited Written Warranty and Express and Implied Warranties**
**15 U.S.C. §§ 2301 *et seq.***
**(On Behalf of Plaintiff and the California Subclass)**

107.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

108.    Plaintiff and the California Subclass members purchased M7 tablets that were manufactured by Defendant.

109.    The retail price for M7 tablets (and the amounts actually paid by Plaintiff and the members of the California Subclass) was as high as $149, and at all times exceeded $25 per tablet.

110.    The M7 tablets purchased by Plaintiff and the members of the California Subclass were sold in California, whether through retail stores physically located in California, or through walmart.com, an entity located in and operating out of San Francisco, California. On information and belief, items sold on walmart.com are identified in California at the time of purchase; offers to purchase are accepted by walmart.com in California; consumers on walmart.com are charged for shipping costs; product shipment and delivery orders are issued by walmart.com from California; and walmart.com imposes online terms that are to be "governed by and construed under the law of the State of California."

111.    M7 tablets are consumer products as defined in 15 U.S.C. § 2301(1) because they are tangible personal property distributed in commerce and are normally used for personal or household purposes.

112.    Plaintiff and members of the California Subclass are consumers as defined in 15 U.S.C. § 2301(3).

113.    Defendant is a supplier and warrantor as defined in 15 U.S.C. §§ 2301(4) and (5) because it is in the business of making consumer products directly or indirectly available to consumers and because it has issued written warranties to consumers.

114.    On the inside of each M7 package, a written "Limited Warranty" is printed on the backside of Monster's "Quick Start Guide." LTI, Defendant's exclusive and actual or apparent agent for warranty service, issued the terms of this "Limited Warranty," and Defendant adopted, ratified, and co-warranted this "Limited Warranty" by including it within each M7 package.

115.    Defendant's "Limited Warranty" covered "parts and labor against manufacturing defects in materials and workmanship for a period of one (1) year." Pursuant to this "Limited Warranty," Defendant promises to repair or replace, at no charge, M7s suffering from such defects.

116.    As such, Monster states, in writing and in connection with each M7 purchase, that it will provide a "Limited Warranty" for a specific period of one year, whereby it will undertake to cover or to otherwise take remedial action with respect to manufacturing defects in materials and workmanship (in the event that such defects exist). By including this "Limited Warranty" on the inside packaging for each M7, Monster offers it in connection with each M7 sale, and it forms part of the basis of the bargain between Monster and each ultimate purchaser of an M7 tablet, including Plaintiff and each member of the California Subclass. Accordingly, Monster's "Limited Warranty" constitutes a "written warranty" pursuant to 15 U.S.C. § 2301(6).

117.    The M7 tablets purchased by Plaintiff and the members of the California Subclass contained numerous defects and failed to perform as Defendant promised. Material

1    manufacturing defects of materials and workmanship with the tablets, present at the time of

2    sale, include but are not limited to:

3              (a)    Micro USB cords manufactured with latching blades of inconsistent

4                     height, but taller than the maximum allowed under Micro USB

5                     specifications, which, combined with other defects, were substantially

6                     certain to cause total device failure within the one-year warranty

7                     period;

8              (b)    Micro USB charging ports, soldered using substandard metals and/or

9                     soldering temperatures and/or soldering techniques, which, combined

10                    with other defects, were substantially certain to cause total device

11                    failure within the one-year warranty period; and

12             (c)    A failure to adjust manufacturing or workmanship processes to

13                    account for substantial, known product defects (*e.g.*, by altering

14                    soldering methods, adding soldering contacts, increasing solder

15                    density, adding epoxy glues, installing modified or updated software,

16                    or other such means).

17        118.    In breach of its "Limited Warranty," Defendant did not repair or replace, at no

18    charge, M7s suffering from these defects.

19        119.    The defects as described above were present at the time of sale for each M7

20    tablet, and thus were not caused by damage while in the possession of Plaintiff and the

21    California Subclass, nor were they the result of unreasonable use.

22        120.    Monster has not demonstrated that workable repairs for the aforementioned

23    defects even exist, and replacing M7s with identical and equally defective M7s cannot bring

24    them into compliance with Monster's "Limited Warranty."

25        121.    Plaintiff notified Defendant of its breaches within a reasonable time by

26    writing to and calling Defendant numerous times within the warranty period. Defendant was

27    also on notice of its design and/or manufacturing defects from the complaints and/or repair or

28    replacement requests that it received or reviewed, and from its testing, diagnostic,

1    maintenance, repair, and/or replacement records.

2       122.    Nevertheless, Plaintiff and the California Subclass were not required to notify

3    Defendant of its breaches because it is a manufacturer and supplier of M7 tablets, not a retail

4    seller, and because affording Defendant a reasonable opportunity to cure its breaches would

5    have been futile. Indeed, even after Plaintiff notified Defendant of its breaches, it refused to

6    acknowledge any defects and would not repair her tablet or replace it with one that did not

7    suffer from such defects, nor would it refund the money she paid.

8       123.    Defendant failed to cure its warranty breaches even after being given a

9    reasonable amount of time and/or a reasonable number of attempts to do so, and did not

10   refund money to Plaintiff of the California Subclass members or otherwise take adequate

11   remedial action.

12      124.    As detailed in Counts III-IV, below, Defendant also made and breached

13   express and implied warranties, under California law, to Plaintiff and the of the California

14   Subclass.

15      125.    As a direct and proximate cause of Monster's warranty representations and

16   breaches, Plaintiff and the other members of the California Subclass have suffered actual

17   damages in the form of the difference between the price they paid for the M7 tablets as

18   warranted and the value of the tablets they actually received. Had Plaintiff and the members

19   of the California Subclass known that their Monster M7 tablets would not be as warranted,

20   they would not have purchased them at the prices paid, if at all.

21      126.    As a result of Defendant's violations of Magnuson-Moss, Plaintiff and the

22   California Subclass seek to recover actual damages, injunctive and declaratory relief, costs

23   and attorneys' fees, and all other available remedies

24                              **COUNT III**
                        **Breach of Express Warranty**
25                     **Cal. Com. Code § 2313 *et seq*.**
                **(On Behalf of Plaintiff and the California Subclass)**
26

27      127.    Plaintiff incorporates by reference the foregoing allegations as if fully set

28   forth herein.

128.    Plaintiff and the members of the California Subclass bought M7 tablets that were manufactured by Defendant.

129.    The M7 tablets purchased by Plaintiff and the members of the California Subclass were sold in California, whether through retail stores physically located in California, or through walmart.com, an entity located in and operating out of San Francisco, California. On information and belief, items sold on walmart.com are identified in California at the time of purchase; offers to purchase are accepted by walmart.com in California; consumers who make purchases on walmart.com are charged for shipping costs; product shipment and delivery orders are issued by walmart.com from California; and walmart.com imposes online terms that are to be "governed by and construed under the law of the State of California."

130.    Defendant made and breached its express written "Manufacture Warranty" and express written "Limited Warranty" as described in Counts I and II, above.

131.    Defendant also expressly warranted by affirmation of fact, promise, and description that M7s conform to "Micro USB" specifications and have 5.0MP cameras and 16GB of storage, and that the batteries within M7 tablets "will be charged" when consumers "[c]onnect the supplied DC charger to the 'Micro USB/Charger Interface' port on the Tablet and the AC outlet on the wall."

132.    Plaintiff and the California Subclass purchased their M7 tablets with the reasonable expectation that they would operate according to the technical specifications on and within the product packaging and would otherwise conform to and be protected by Defendant's express warranties. Plaintiff and the California Subclass relied on the accuracy of Defendant's express warranties when making their purchasing decisions, and these express warranties formed part of the basis of the bargain for their purchases. If Plaintiff and the California Subclass members had known that M7 tablets were not as expressly warranted, they would not have bought them at the prices paid, if at all.

133.    The M7 tablets were not as expressly warranted and failed to perform as Defendant promised. Defendant breached its express warranties by producing and selling M7

1  tablets with design defects and in substandard condition with defects in workmanship and
2  materials. These defects made it substantially certain that such tablets would fail to operate
3  properly throughout the one-year warranty period. Rather, defects present at the time of sale
4  have consistently and predictably rendered the M7 tablets inoperable within the applicable
5  warranty period.

6      134.    Further, at the time of each M7 sale to Plaintiff and the members of the
7  California Subclass, Defendant's M7 tablets did not conform to the written technical
8  specifications listed on the product packaging, such as meeting "Micro USB" specifications,
9  having 5.0MP cameras, or having 16GBs of storage.

10     135.    Defendant has failed to honor its express warranties and has failed to repair or
11  replace, free of charge, defective M7 tablets with tablets that have been cured from the
12  aforementioned defects.

13     136.    The defects in M7s were not open or obvious to consumers prior to purchase.

14     137.    Plaintiff notified Defendant of its breaches within a reasonable time by
15  writing and calling Defendant within the warranty period. Defendant was also on notice of its
16  design and manufacturing defects from the complaints and repair or replacement requests
17  that it received or reviewed, and from its testing, diagnostic, maintenance, repair, and
18  replacement records.

19     138.    Nevertheless, Plaintiff and the California Subclass were not required to notify
20  Defendant of its breaches because it was the manufacturer and supplier of M7s, not the retail
21  seller, and because affording Defendant a reasonable opportunity to cure its breaches would
22  have been futile. Indeed, even after Plaintiff notified Defendant of its breaches, it refused to
23  acknowledge the defects or repair or replace her tablet in a manner that cured the defects.

24     139.    As a direct and proximate cause of Monster's express warranty
25  representations and breaches, Plaintiff and the other members of the California Subclass have
26  suffered actual damages, in the form of the difference between the prices they paid for the
27  M7 tablets as warranted and the value of the tablets they actually received.

28     140.    Plaintiff and the Class members are entitled to recover actual and incidental

1  damages, including diminution in value, costs, attorney fees, and other relief as authorized by

2  law.

3                                            **COUNT IV**
                        **Violations of the Song-Bervely Consumer Warranty Act**
4                            **Breach of Express and Implied Warranties**
                                 **Cal. Civ. Code §§ 1792 *et seq.***
5                       **(On Behalf of Plaintiff and the California Subclass)**

6          141.    Plaintiff incorporates by reference the foregoing allegations.

7          142.    Plaintiff and the members of the California Subclass purchased M7 tablets

8  that were manufactured by Defendant.

9          143.    The M7 tablets purchased by Plaintiff and the members of the California

10  Subclass were sold in California, whether through retail stores physically located in

11  California, or through walmart.com, an entity located in and operating out of San Francisco,

12  California. On information and belief, items sold on walmart.com are identified in California

13  at the time of purchase; offers to purchase are accepted by walmart.com in California;

14  consumers who make purchases on walmart.com are generally charged for shipping costs;

15  product shipment and delivery orders are issued by walmart.com from California; and

16  walmart.com imposes online terms that are to be "governed by and construed under the law

17  of the State of California."

18          144.    At the time of their M7 purchases, Defendant was in the business of selling

19  consumer electronics like the M7 and held itself out as having special knowledge and skill

20  regarding such goods.

21          145.    As detailed in Counts I-III, above, Defendant gave Plaintiff and the members

22  of the California Subclass several express written warranties, including a full "Manufacture

23  Warranty" against all defects, a "Limited Warranty" against defects in materials or

24  workmanship, and several written affirmations of facts, including but not limited to express

25  warranties that M7s conform to "Micro USB" specifications, have 5.0MP cameras, have

26  16GB of storage, and are designed such that their batteries "will be charged" when

27  consumers "[c]onnect the supplied DC charger to the 'Micro USB/Charger Interface' port on

28  the Tablet and the AC outlet on the wall."

146.    As detailed in <u>Counts I-III</u>, above, Defendant breached these express written warranties by selling substandard M7 tablets with design defects and manufacturing defects of workmanship and materials. These defects, present at the time of sale, made it materially unlikely that such tablets would operate properly throughout the one-year warranty period. Further, defects present at the time of sale prevented the M7 tablets from operating at a level consistent with their expressly warranted written technical specifications.

147.    By operation of law, Monster also issued implied warranties that its M7s are merchantable, in that they would, at a minimum, be fit for the ordinary purposes for which such goods are used.

148.    The intended and ordinary purpose of an M7 tablet is to operate as a functioning tablet computer.

149.    Defendant breached its implied warranties by producing and selling M7 tablets with design defects and in substandard condition with defects in workmanship and materials. These defects made M7 tablets unfit for their intended and ordinary purposes because they caused M7s to be substantially certain to prematurely fail and to cease operating as functioning tablet computers, as well as to "freeze" periodically and to function below their advertised specifications.

150.    By operation of law, Monster also issued implied warranties that its M7s are merchantable, in that they would, at a minimum, conform to the promises or affirmations of fact made on the container, such as that they will meet "Micro USB" specifications and have 5.0MP cameras and 16GB of storage.

151.    Defendant breached its implied warranties by selling M7 tablets that did not conform to the promises or affirmations of fact made on the packaging, since M7s do not meet "Micro USB" specifications and do not have 5.0MP cameras or 16GB of storage.

152.    Any attempts by Defendant to disclaim or limit any implied warranties of merchantability or any remedies are invalid, because it offers a full written warranty, and also because any such disclaimers or limitations are ambiguous, inconspicuous, unconscionable, and unable to be reasonably construed as consistent with the various express written

warranties and conduct as demonstrated by Monster.

153.    The defects in M7s were not open or obvious to consumers prior to purchase.

154.    Plaintiff notified Defendant of its breaches within a reasonable time by calling and writing to Defendant within the warranty period. Defendant was also on notice of its design and manufacturing defects from the complaints and repair or replacement requests that it received or reviewed, and from its testing, diagnostic, maintenance, repair, and/or replacement records.

155.    Nevertheless, Plaintiff and the California Subclass were not required to notify Defendant of its breaches because it was the manufacturer and supplier of M7s, not the retail seller, and because affording Defendant a reasonable opportunity to cure its breaches would have been futile. Indeed, even after Plaintiff notified Defendant of its breaches, it refused to acknowledge the defects or repair or replace her tablet in a manner that cured the defects.

156.    As a direct and proximate cause of Monster's warranty representations and breaches, Plaintiff and the other members of the California Subclass suffered actual damages in the form of the difference between the price they paid for the M7 tablets as warranted and the value of the tablets they actually received. Had Plaintiff and the members of the California Subclass known that their Monster M7 tablets were not as warranted, they would not have purchased them at the prices paid, if at all.

157.    The M7 tablets were not altered by Plaintiff or the members of the California Subclass and were defective when they left the exclusive control of Defendant.

158.    Defendant knew that its M7 tablets would be purchased and used by consumers, such as Plaintiff and the California Subclass, that do not have the requisite technical expertise to independently inspect the tablets for defects that would cause premature failure.

159.    Defendant has not repaired or replaced the M7 tablets purchased by Plaintiff or the California Subclass in a manner sufficient to cure the aforementioned defects.

160.    Defendant's failure to comply with its express and implied warranty obligations was both knowing and willful.

161.    Pursuant to Cal. Civ. Code § 1794, Plaintiff and the Class members are entitled to costs, expenses, attorneys' fees, as well as two times the amount of actual damages due to the willfulness of Defendant's failure to comply with its express warranty obligations.

**COUNT V**
**Violation of California's Consumer Legal Remedies Act**
**Cal. Civ. Code §§ 1750 *et seq.***
**(On Behalf of Plaintiff and the California Subclass)**

162.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

163.    The Consumers Legal Remedies Act ("CLRA") applies to Defendant's actions and conduct as described herein because it extends to transactions that are intended to result, or which have resulted, in the sale of goods or services to consumers.

164.    Defendant is a "person" as defined by Cal. Civ. Code § 1761(c).

165.    Plaintiff and each member of the California Subclass are "consumers" as defined by Cal. Civ. Code § 1761(a).

166.    Defendant's M7 tablets are "goods" within the meaning of Cal. Civ. Code § 1761(a).

167.    As described herein, Defendant failed to disclose the M7 defects to Plaintiff and the members of the California Subclass in violation of Cal. Civ. Code §§ 1750, *et seq.* Specifically, Defendant violated Cal. Civ. Code §§ 1750 *et seq.* in at least the following ways:

(a)    In violation of § 1770(a)(5) by representing that M7 tablets have characteristics, uses, and benefits which they do not have, including but not limited to Micro USB-compliant ports and cords, 5.0MP cameras, and 16GB of storage;

(b)    In violation of § 1770(a)(7) by representing that M7 tablets are of a particular standard or quality when they are actually of another; and

(c)    In violation of § 1770(a)(9) by advertising M7s as having, among other things, Micro USB-compliant ports and cords, 5.0MP cameras,

and 16GB of storage, with the intent not to sell them as advertised.

168.    Defendant, acting with knowledge, intentionally and unlawfully brought harm upon Plaintiff and the California Subclass by omitting from its advertisements, marketing, and documentation any statement that it designed and/or manufactured the M7 tablets with defects that would render them unusable within less than a year, or any statements that M7s did not perform with the specifications as expressly advertised.

169.    Defendant knew that its M7 tablets suffered from inherent defects, were defectively designed and manufactured, would fail prematurely, did not operate at advertised specifications, and were not suitable for their intended use.

170.    Defendant was in a superior position to know the true state of facts about and the existence of the defects found in the M7 tablets, because it was aware of its design and manufacturing processes, the actual performance specifications, as well as the coupling and uncoupling forces that would be placed on the M7 tablets through regular and reasonable use.

171.    Plaintiff and the California Subclass members, on the other hand, could not have reasonably been expected to learn or discover that their M7 tablets contain defects or unexpected performance specifications until they occur.

172.    Defendant, as a leading consumer electronics manufacturer, knew that Plaintiff and the members of the California Subclass could not reasonably have been expected to learn about or discover the defects or performance limitations before making purchasing decisions.

173.    Further, Defendant was aware of its own design and/or manufacturing defects and actual performance specifications.

174.    As such, Defendant owed Plaintiff and the California Subclass members a duty to disclose the defect found in the M7 tablets.

175.    By failing to disclose these defects, Defendant has been knowingly and intentionally concealing material facts and breached its duty not to do so.

176.    The facts concealed or not disclosed by Defendant to Plaintiff and the members of the California Subclass are material because a reasonable consumer would have

considered them to be important in deciding whether or not to purchase the M7 tablets. Had

Plaintiff and the other members of the California Subclass known that the M7 tablets were

defective and were functionally deficient, they would not have purchased the M7 tablets or

would have paid less for them.

177.    Plaintiff and the members of the California Subclass reasonably expected that

their M7 tablets would be free from defects, would perform as advertised, and would not

prematurely fail.

178.    Thus, as a direct and proximate result of Defendant's failure to disclose its

design and/or manufacturing defects, Plaintiff and the California Subclass members were

harmed to the extent they paid a premium for M7 tablets, when, had they known of the

defect, they would not have purchased M7 tablets at the prices paid, if at all.

179.    Under Cal. Civ. Code § 1780(a) and (b), Plaintiff, individually and on behalf

of the California Subclass, demands that Defendants correct, repair, replace, or otherwise

rectify the defective M7 tablets, and further seeks an injunction requiring Defendant to cease

and desist the illegal conduct alleged in this Complaint, along with costs, reasonable

attorneys' fees, and all other appropriate remedies for its violations of the CLRA.

**COUNT VI**
**Violations of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200 *et seq.***
**(On Behalf of Plaintiff and the California Subclass)**

180.    Plaintiff incorporates by reference the foregoing allegations as if fully set

forth herein.

181.    California's Unfair Competition Law ("UCL"), Cal Bus. & Prof. Code

§§ 17200, *et seq.*, protects both consumers and competitors by promoting fair competition in

commercial markets for goods and services.

182.    The UCL prohibits any unlawful, unfair, or fraudulent business act or practice,

including the employment of any deception, fraud, false pretense, false promise,

misrepresentation, or the concealment, suppression, or omission of any material fact. A

business practice need only meet one of the three criteria to be considered unfair competition.

183.    The existence of a material defect in a product is a material term of any transaction because it directly affects a consumer's choice of, or conduct regarding, whether to purchase a product.

184.    The technical performance specifications for a product are material terms of any transaction because they directly affect a consumer's choice of, or conduct regarding, whether to purchase a product.

185.    As described herein, Defendant has engaged in deceptive business practices, as defined by the UCL, by failing to disclose that M7 tablets contain material defects that cause premature failure, despite knowing that the M7 tablets contained such defects.

186.    As described herein, Defendant has engaged in deceptive business practices, as defined by the UCL, by advertising M7 tablets as having technical specifications which they do not have and by failing to disclose these performance deficiencies, despite knowing of such deficiencies itself.

187.    Plaintiff's M7s failed because of Monster's design and/or manufacturing defects within Monster's one-year warranty.

188.    Defendant was in a superior position to know the true state of facts about and the existence of the defects found in the M7 tablets and the actual technical specifications for such tablets because it was aware of its design and manufacturing processes, as well as the performance capabilities and the coupling and uncoupling forces that would be placed on the M7 tablets through regular and reasonable use.

189.    Plaintiff and the California Subclass members, on the other hand, could not have reasonably been expected to learn or discover that their M7s did not perform as advertised or that M7 tablets contain any defects until after making their purchasing decisions.

190.    Defendant, as a leading consumer electronics manufacturer, knew that Plaintiff and the members of the California Subclass, as reasonable consumers, could not have been expected to learn about or discover its design and/or manufacturing defects and performance failures.

191.    As such, Defendant owed Plaintiff and the California Subclass members a duty to disclose the defect found in the M7 tablets.

192.    Defendant violated the UCL's unfair prong by causing substantial injury to consumers by failing to disclose the existence of the defect contained in the M7 tablets and by falsely advertising and failing to disclose the technical product specifications for M7 tablets. The injuries caused by Defendant's unfair conduct are not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not have reasonably avoided.

193.    Given the information asymmetry between Defendant and consumers regarding the M7's design, manufacturing process, and operation, Defendant knew or had reason to know that Plaintiff and the California Subclass could not have reasonably known or discovered the existence of its design and/or manufacturing defects or performance specifications.

194.    Defendant has also violated the UCL's unlawful prong by violating the CLRA, as described above.

195.    Plaintiff and members of the California Subclass reasonably expected that their M7 tablets would perform with the advertised product specifications.

196.    Defendant's unlawful and unfair conduct occurred during the marketing and sale of its consumer electronic products, and therefore occurred in the course of Defendant's business practices.

197.    Defendant's unfair and unlawful conduct directly and proximately caused Plaintiff and the California Subclass a loss of money or property in the form of the premium price paid for their Monster M7s.

198.    But for Defendant's conduct as described herein, Plaintiff and the California Subclass would not have purchased the Monster M7 tablets, or would have paid substantially less for them.

199.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order (1) requiring Defendant to cease the unfair and unlawful practices described herein; (2) requiring

1   Defendant to restore to Plaintiff and each California Subclass member any money acquired

2   by means of unfair and/or unlawful competition (restitution); and, (3) awarding reasonable

3   costs and attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5.

4                               **PRAYER FOR RELIEF**

5          WHEREFORE, Plaintiff Antonette Grays, on behalf of herself and the Classes,

6   respectfully requests that the Court enter an order:

7          A.     Certifying this case as a class action on behalf of the Classes defined above,

8   appointing Antonette Grays as representative of the Classes, and appointing her counsel as

9   class counsel;

10         B.     Declaring that Defendant's actions, as set out above, violate the Magnusson-

11  Moss Warranty Act, the California Commercial Code, the Song-Beverly Consumer Warranty

12  Act, the CLRA, and the UCL;

13         C.     Awarding damages, including statutory and punitive damages where

14  applicable, to Plaintiff and the Classes in an amount to be determined at trial;

15         D.     Awarding Plaintiff and the Classes their reasonable litigation expenses and

16  attorneys' fees;

17         E.     Awarding Plaintiff and the Classes pre- and post-judgment interest, to the

18  extent allowable;

19         F.     Awarding such other injunctive and declaratory relief as is necessary to

20  protect the interests of Plaintiff and the Classes; and

21         G.     Awarding such other and further relief as the Court deems reasonable and just.

22                             **DEMAND FOR JURY TRIAL**

23         Plaintiff demands a trial by jury for all issues so triable.

24                                            Respectfully submitted,

25  Dated:  February 11, 2016              **ANTONETTE GRAYS**, individually and on
                                           behalf of all others similarly situated,
26

27                                         By: /s/ Todd M. Logan

28                                            One of Plaintiff's Attorneys

Todd M. Logan (SBN 305912)
tlogan@edelson.com
Rafey S. Balabanian*
rbalabanian@edelson.com
Alicia Hwang*
ahwang@edelson.com
EDELSON PC
329 Bryant Street
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

Eve-Lynn Rapp*
erapp@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Pro hac vice admission to be sought.

Attorneys for Plaintiff and the Putative Classes